ORIGINAL

FILED IN OPEN COURT
U.S.D.C. Atlanta

JUL -7 2020

James N. Hatten, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LOUIS BERIA | Criminal Indictment<br><br>No. 2 20-CR-026 |

THE GRAND JURY CHARGES THAT:

### Counts One through Five
### Wire Fraud

1. Beginning on a date unknown, but from at least in or about June 2014, and continuing through at least in or about July 2015, in the Northern District of Georgia and elsewhere, the defendant, LOUIS BERIA, did knowingly devise and intend to devise a scheme and artifice to defraud W.W., and to obtain money and property from W.W. by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, well knowing and having reason to know that said pretenses, representations, and promises were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material.

### Scheme to Defraud

2. For several years, BERIA worked with W.W. to obtain, manage, and develop properties in Georgia.

3. In connection with this work, BERIA had a company called LSC1 Management. W.W. was aware that BERIA owned and operated LSC1 Management.

4. W.W. purchased two properties in 2014. In connection with one of these properties, BERIA sent W.W. a false letter that was purportedly from the U.S. Army Corps of Engineers. After receiving this false letter, W.W. entered into a land clearing agreement with LSC1.

5. In or about June 2014, BERIA and T.J.H. formed LoTi Investment and Management LLC, also known as LoTi Investment and Management Group LLC. W.W. was not aware that BERIA had an ownership interested in LoTi.

6. In or about June 2015, W.W., through an LLC, agreed to purchase the Westminster Square Apartments in Marietta, Georgia, for $43,500,000. P.B was the closing attorney in connection with this purchase.

7. On or about June 24, 2015, P.B. emailed BERIA a closing statement for the Westminster Square Apartments. The closing statement was on Moore Ingram Johnson & Steele, LLP, letterhead, and concluded that $976,425 would be due at closing.

8. Later that day, BERIA emailed a false closing statement to W.W., through W.W.'s assistant. The false closing statement copied the closing statement sent by P.B., including that it was on Moore Ingram Johnson & Steele, LLP letterhead. It added a charge of $4,423,575.00 for "Referrals, Site Visits Real Estate Commission, Title Searches, Survey And Closing Coordination and Closing

Transactions." This addition resulted in a total of $5,400,000 being due at closing.

9. On or about July 5, 2015, BERIA emailed a letter to W.W. regarding financial aspects of the Westminster Square Apartment transaction. BERIA wrote in part:

> Please keep in mind that some of the contents of this letter is highly confidential and it is only meant for you alone.
> A) In regards to your question On Mr. [J.H.], USD 435,000.00
> [J.H.] was hired by a company by the name of Loti investment and Management Group. . . . Mr. [H.] payment is part of the $5.4M owed to Loti and this not to be paid by you, but only by Loti Investment group, who would have covered all closing fees, title fees and Attorney fees. But since this company was not paid at the closing table, other measures had to be taken by me to ensure the closings moved forward, If not the closing would have been jeopardized and you could have been at risk forfeiting the entire transaction, of which all your money could have been held by the seller legally. . . .
> In addition I would like to share with you some highly classified information, but you have to commit not to share this with anyone.
> I found out that Loti Investment Group is in the process of hiring an Attorney and there are filing a Law suit against all your holdings in America. This is very dangerous for our business here in Atlanta. This could potentially cripple our entire operation here for a very prolonged period of time. Besides, I also managed to gather some information that this group of people is highly connected with the networks of politics and Government. I strongly suggest that you pay this Loti Group the $5.4M so they can cover all expenses and fees for the entire closings. No other money is owed by you to anyone else. This is the agreement that is in place. By paying them you can avoid all types of Law Suits and Liens on all of your assets here in the US. I am only letting you know this information because of the full trust I have in you, and ask you to please regard this with the highest form of confidentiality. . . .

> I must advise that this group of Loti Investment are very powerful and can have a negative impact on our entire operation here in Atlanta.

10. BERIA did not tell W.W. that he was an owner of LoTi.

11. On or about July 7, 2015, W.W. asked about the "doctored" closing statement BERIA sent. W.W. had not agreed to pay LoTi any commissions and questioned what work LoTi did related to the acquisition of the Westminster apartments.

12. On or about July 8, 2015, the email account Lotiinvestmentsandmanagment@gmail.com was created.

13. That same day, that email account sent BERIA a document purporting to be a detailed billing from LoTi regarding the Westminster Apartments. BERIA forwarded that message including the document to W.W.'s assistant the following day, on or about July 9, 2015.

14. That document purportedly described LoTi's role in the purchase of the Westminster Apartments. It stated in part:

> Loti Investment was contacted in March 2015 by LSC1 Management to begin looking for large tracts of investment properties or large apartment complexes in the north Georgia area for one of its clients . . . .
> Loti stayed in constant contact with LSC1, [P.B.], [J.H.] and the current management company during the course of the negotiation and sale. . . .
> On June 9, 2015, Mr. [P.] met with a repetitive from Loti, and a consulting/management services agreement was negotiated. The price was $5,400,000.00.

BERIA did not tell W.W. that he was a part owner of LoTi.

4

15. On or about July 12, 2015, BERIA emailed W.W.'s assistant a letter for W.W. BERIA wrote in part:

> Dear Mr. [W.],
> I finally finished with the negotiation and have arrived and at a conclusion with Loti Group. It took lots of effort and perseverance to convince them, it was very difficult to try to negotiate with them, but I finally manage to bring Loti Group to agree and come to a settlement for a negotiated amount of $4,950,000. USD. After the deduction of [J.H's] $435,000.00, the final amount owed to them is $4,515,000.00. It is extremely important to send wire within the next two business days is the condition set forth. . . . I have tried my very best to negotiate this amount for you, but was encountered with fierce resistance from their staff, however I am happy that I was able to come to an agreement to settle for the above amount of $4,950,000.00 USD. Also agreed upon that Loti will furnishing you with a full satisfaction and complete release with no further claim in the future.

16. Again, BERIA did not tell W.W. that he was a part owner of LoTi.

17. On or about July 13, 2015, W.W. wired $4,515,000 to LoTi's bank account at the Bank of the Ozarks, ending in x5919.

18. The next day, $2 million was transferred from the LoTi bank account to an account controlled by BERIA and his wife.

19. On or about July 14 and 15, 2015, BERIA and T.J.H. created a purported release between LoTi and W.W. On July 15, 2015, BERIA sent this release to W.W.'s assistant to have W.W. sign it. W.W., through his assistant, asked if it was necessary for W.W. to sign the release.

20. On or about July 21 and 22, 2015, BERIA and T.J.H. created a new document for W.W. On or about July 22, 2015, T.J.H., using the lotiinvestmentsandmanagment@gmail.com email address, sent BERIA the document, to be forwarded to W.W. BERIA then emailed the document to W.W.'s assistant for delivery to W.W. The document stated:

> Mr. [W.W.],
> Our invoice has been paid in full. Your signature is not required on the previous document, just as a matter of record keeping we offer a signature space. We are sorry for any inconvenience that our earlier correspondence may have created.
> Kindest Regards,
> Loti Investment and Management Group

21. The document was not signed and did not indicate anywhere that BERIA was responsible for drafting it or that BERIA was a partial owner of LoTi.

22. On or about the dates set forth below, in the Northern District of Georgia and elsewhere, the defendant, LOUIS BERIA, knowingly devised and participated in the aforesaid scheme and artifice to defraud, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, as well as by omissions of material fact, knowing and having reason to know that the pretenses, representations, promises, and omissions were and would be material, did cause the following wire communications to be transmitted in interstate commerce:

| Count | Date | Description |
| --- | --- | --- |
| One | July 9, 2015 | Email from LOUIS BERIA to S.G. with a subject line reading "Fwd: detailed billing from Loti" |
| Two | July 12, 2015 | Email from LOUIS BERIA to S.G. with a subject line reading "Letter to Mr. [W.]" |
| Three | July 13, 2015 | Wire transfer of $4,515,000 from W.W. to a LoTi Investment and Management account at the Bank of the Ozarks, account number ending in x5919 |
| Four | July 15, 2015 | Email from LOUIS BERIA to S.G. with a subject line reading "Fwd: release" |
| Five | July 22, 2015 | Email from LOUIS BERIA to S.G. with a subject line reading "Fwd: Letter to Mr. [W.]" |

All in violation of Title 18, United States Code, Section 1343 and Section 2.

## Forfeiture

Upon conviction of one or more of the offenses alleged in Counts One through Five of this Indictment, the defendant, LOUIS BERIA, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of the violation, including, but not limited to, the following:

a. MONEY JUDGMENT:   A sum of money in United States currency representing the amount of proceeds obtained as a result of each offense, or conspiracy to commit such offense, for which the defendant is convicted.

If, as a result of any act or omission of the defendant, any property subject to forfeiture:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third person;
c. has been placed beyond the jurisdiction of the Court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A __True__ BILL

_____
FOREPERSON

BYUNG J. PAK
  *United States Attorney*

CHRISTOPHER J. HUBER
  *Assistant United States Attorney*
Georgia Bar No. 545627

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181